The Court of Appeals having adjudicated the questions made by the three last grounds of appeal, sent the question, made by the first, up to the Court of Errors, which that Court decided as follows:—
Curia, per "Wardlaw, J.
The Court of Appeals has considered the three last grounds of appeal, and found them insufficient to sustain the defendant’s motion. The first ground has been referred to the Court of Errors, and to that only attention will now be directed.
By an Act of 1845, the term prescribed for the Court for Richland District is two weeks, beginning on Monday. In this case the jury retired to consider of their verdict, about 10 o’clock Saturday night of the first week. They returned into the court room about fifty minutes after the town clock of Columbia had struck twelve. No adjournment having taken *488 place, their verdict was then received and published, and was |,y tjie Q-[er¡c entered in the minutes of Saturday.
Is this verdict a nullity?
The defendant, relying on the maxim dies dominicus non est dies jur'idicus, contends that, by the common law, no court can do any judicial act on Sunday; that the common law, in this respect, has never been abrogated here, but has been confirmed by our legislation and usage ; that the publishing of a verdict is a judicial act, and that that act was in this case done on Sunday.
The plaintiff insists that this case falls within exceptions to the maxim which existed at common law, or have been introduced by our institutions and statutes ; if not, that the act done was not a judicial act; that the time of the act was not Sunday; and finally that the act was done within the term, and neither common law nor statute here makes null any act done by a court within term time, because of its having been done on Sunday.
Whether the Levitical law forbade the trial of causes on the Sabbath; how far the sanctity of the Jewish Sabbath has, by divine authority, been transferred to the Lord’s day; and what has been held or should be held on the matters here in dispute, by ecclesiastical authorities or biblical scholars, are questions not involved in the case. Our business is with the municipal law of the State. Other laws, unless they form part of that, need be looked to only when they serve to explain its history or define its meaning.
1* The leading case to show that at common law a judgment could not be given on Sunday, is Swann v. Broome, in which the opinion of the Court of King’s Bench, pronounced by Lord Mansfield, and afterwards affirmed in the House of Lords, is best reported by Sir James Barrow, and the arguments of counsel, especially of Blackstone for the plaintiff in error, who finally prevailed, will be found in Sir W. Blackstone’s reports.
That case came before the King’s Bench, by a writ of error, from the Court of Common Pleas, upon a judgment in a common recovery suffered there. Under the form in which the summons had been made returnable, the judgment could not have relation to any day earlier than a certain Sunday, and on that Sunday the tenant in tail died. So the question was, whether by possibility the Court of Common Pleas could be supposed to have sat on that day, and to have given the'judgment. Whilst the case admits that the common law, in relation to Sunday, extends its prohibition no further than against awarding process, giving judgment, and such like acts of *489 court; and that fairs, (a) markets, sports, (b) pastimes, and all other transactions, (c) not prohibited by Statute, are not unlawful on Sunday, it conclusively establishes that, by common law, neither of the courts of law at Westminster can do any judicial act on Sunday.
It admits that Parliament (d) may sit on Sunday, of which various instances may be found cited there and elsewhere; (e) and it seems safe to conclude that, although the general custom has been for the House of Lords, when sitting as a Court ef Appeals, or a court for the trial of impeachments, to avoid sitting on Sunday; yet such a sitting would, if ever questioned, be held to fall within some of the relaxations of the common law rule which have happened, as Lord Mansfield expresses it.
2. That case also leaves untouched the question, concerning the sitting on Sunday of inferior courts, or courts of any kind which are not confined to the terms established for the law courts at Westminster ; and that question is the one involved here, and is not free from difficulty, whether we look to decided cases, or to that “history of the law and usage as to courts of justice sitting on Sundays,” which Lord Mansfield found to make “an end of the question” before him.
From digests and elementary writers of the highest authority, numerous citations might be made to show that in England an inferior court cannot, by common law, do any judicial act on Sunday. Probably it is because instances of this law *490 violated have been rare, that cases directly affirming the law are few ; but certainly cases which are usually referred to, are not very satisfactory.
Fish v. Brokel is authoritative only as to the courts at Westminster, for the proclamations which were set aside there, because one of them was recited as having been made on Sunday, were made in open court in term at the King’s Bench.
In Page v. Faucet, where a judgment from Lynn was reversed, because the day on which it was recited .to have been given was Sunday, it appears from a report of the same case, in Leonard 328, that according to the record,' the court at Lynn should, by prescription, have been holden on Wednesday.
Hyde v. Cornwallis, where a writ of inquiry, executed on Sunday, was held void, depended upon the Stat. 29 Chs. 2, which made void the execution of writs on Sunday.
In Dakin's case, the presentment and record of a fine imposed in a court-leet, having been certified into the King’s bench by certiorari ; it thence appeared that the court-leet was held “within a month alter Michaelmas, to wit: on Tuesday, 12th November.” The leet could not, under certain statutes, be held any other time but within a month after Easter or Michaelmas. Michaelmas was on the 29th September ; and so, although the general allegation was that the court was held within the month, the scilicit shewed that it was held after the expiration of the month. It was admitted that the scilicit being contrary to the precedent matter, was void; but it being void, no day at all appeared when the court was held; “ and,” (says Saunders, reporting the opinion of the court) “ there ought to be a certain day shewn when the court was held; and it is not sufficient to say, that the court was held within a month after Michaelmas, generally, fot perhaps it was held on Sunday, which is a dies non juridicns, and so void, and therefore, a certain day ought to appear on the record ; and for this cause, the presentment was quashed by the whole court.”
If there had been no dies non juridici, the certainty required in a record of judicial proceedings, might well have been held to demand that the day on which the court sat should appear; and therefore, the scilicit alleging matter which was material, the repugnancy between it and the preceding matter vitiated the record. The obvious purpose of the sci-licit was, to particularize that which had been general, and notwithstanding a technical rule, it would have been hard for any mind to attain the conclusion, that from the record it appeared, (as it was necessary it should have appeared) that the court had been held within the month, as required by the statutes. Another report of this case in 2 Kable, 731, shews that the record was further objectionable, because the sitting *491 of the court was stated to have been, “ to wit: 18 Nov. per adjourn, proedict,” when no previous adjournment had entered. See also, S..C. 1 Tent. 107.
_ The proposition that the judicial proceedings of an inferior court held on Sunday are void, thus suggested in Dakin's case, as a reason for requiring a particular day when it was held to appear in the record of such a court, is adopted as established law by Sergeant. Hawkins, P. C. B. 2, c. 10, sec. 9; and the suggestion was made by Sir Edmund Saunders, as of a thing certain whence argument might be drawn. It would then be rash to dispute what is so stated; but if there be not some case which has not been brought to the view of this court, and which diligent search has not enabled me to find, the proposition, before the statute of 3 and 4 Wm. 4, de~ pended in England upon frequent recognition, and not, like the maxim applicable to the law courts at Westminster, upon any direct decision.
3. The “ history” which made an end of the question in tSwann v. Broome, shews that the whole subject of dies non juridici is connected with the Terms at Westminster; so that, as Lord Coke says, “ dies juridici, (except it be in the assizes,) are only in the term.” The dies non juridici, therefore, comprehend all days in vacation, and a few that fall within the course of the terms.
I have thrown into an appendix Lord Mansfield’s summary of this history, with various extracts from other sources and annotations, from which I think it may be premised that there is much uncertainty as to what was the ancient common law on the subject of days unjudicial; and much reason to believe that it fluctuated according to the greater or less influence which, at different periods, was exercised by the clergy. It may readily be supposed, that whilst in the struggles between the Church and the State, the King’s Courts were compelled to the observance of many holy seasons, less jealousy was entertained towards the inferior courts, that were mostly held under the greater Barons. The Hundred court and county court under the Saxons were held every four weeks, or oftener, yet this must have been by frequent violations of the law of Edward the Confessor, and of Saxon laws and canons previously existing. Down to the time of Hen. 6, fairs were habitually held on Sundays and other great festival days; yet to every fair was incident a court of Piepoudre, for summary decision of the questions arising therein.
It will be observed, that there never was, prior to the Statute 3 and 4 Wm. 4, any period when the prohibition of a court’s sitting on certain days, did not embrace equally Sundays and some other days, and that even that statute makes six other days (none of which falls within the ordinary terms) *492 holidays in the offices and courts, as Sunday is. The case Harrison v. Smith, as late as 1829, questions the case of Mesure v. Britton, and shews that the day of the. purification, and each of the other dies non, then acknowledged, as well as Sundays, were days on which, in Term, a law court at Westminster could do no judicial act; so that, although public offices might be opened, and such business as could be done at a Judge’s chambers be transacted, a plea could not be required to be filed on one of those days, for by mere fiction> a^- pleading was supposed to be done in court. And the case of Osborne v. Taylor, likening other dies non to Sunday, held that a bill of Middlesex, returnable on Ascension day, was irregular, to such extent that the objection could not be waived by the defendant, any more than an objection to proceedings on Sunday could be waived.
Com. Dig. Temp. E. 6, “ where, by custom, the court of a Lord is to be held every Monday, if it falls upon Christmas or New Year’s day, which are not judicial, yet the court may adjourn.
“ So, if the county court happens upon such a feast, they may elect knights to parliament, but a judicial process or entry of judgment upon such a,day is void.”
It was probably in reference to this permission on holidays of all business in courts but judicial business, that the late Act for Parliamentary reform declares, that the county court in which the sheriff is to open the poll books, shall not be held on a Sunday, but on the following Monday.
But is it to be understood that inferior courts in England were, before W. 4, bound to the observance of all the holy seasons and days enumerated by Britton, * or to all, with the exceptions made by the Statute West. 1, as to Advent and Lent, for certain assizes, or only to those enumerated in the Stat. 5 and 6 Ed. 6? If to the last only, was the obligation a common law obligation surviving that Stat. of Ed. 6, as to holidays not abrogated by it, or was it an obligation arising from the injunction of the statute, that the holidays therein enumerated should be kept? What has been the practice of the courts in the United Kingdom, not bound by the Terms, I am not informed; but from general history it may be learnt that the courts of Assize and Nisi Prius, held in the vacations by the Judges of the superior courts, and so considered to be emanations from those courts, have ordinarily respected neither the ancient common law, nor the Stat. of Ed. 6, as to holidays, but for a long time past, have sat on the Epiphany and various Saints days, which were “jours defendus,” both by that statute and the common law which preceded it. There is no reason to suppose that other courts not bound by the Terms, regarded Candlemas, or holy Thursday or Midsummer Day, any more than they did other more important *493 festivals. The suspension of business on Sunday proceeded from that “decent observance of the Sabbath,” which, int Mesure v. Britton, before cited, was,'by Lord Loughborough, (who had been bred under the discipline of the Scotch Kirk, and was the Chief Justice of the Common Pleas) distinguished from the respect which should be paid by the court to the other dies non. However plain enough the “ history,” as to the law courts at Westminster, I apprehend that if the Stat. of Ed. 6 did not furnish the rule, it is upon modern usage that the observance of Sundays and a few other holidays, in other courts in England, rested, before the Stat. of Wm. 4. If so, was this observance left to the discretion of the court, maintained only by a public opinion which would not tolerate its neglect, or was it enforced by any law that made proceedings in disregard of it, absolutely void ? This, and other questions, which I have suggested, I pretend not here to answer ; for in reference to the case before me, argued to come within the common law rule laid down in Swann v. Broome, it is enough to shew that the history decision of that case is not, without important distinctions, to be applied to all courts.
4. If the common law made all judicial proceedings on the Lord’s day void, what portion of time was embraced in the prohibition 1
Yery clearly, by the.- common law, as by the Roman civil law, a day ordinarily begins and ends at midnight; and if a statute mentions Sunday or other day without explanation, an ordinary day is meant. Therefore we find that service of process, between midnight of Saturday and sunrise Sunday morning, was, under the Stat. 29 Ch. 2, held to be bad. But in any law, as in any other use of language, the meaning of a word used may be made different from its ordinary meaning, by accompanying explanation. Thus, in the case of Fox v. Abel, the term Lord's day, used in a statute of Connecticut, which was copied from one of Massachusetts, was, in the opinion of a majority of the Judges who heard the • case, so explained by other words in the statute, as to mean only the solar day, from sunrise to sunset. In the law of Edward the Confessor, so prominent in the history of the common law, concerning Sunday, all doubt is removed by the express words: “ omnibus sabbatis ah hora nona," that is, (according to the division which both Jews and Romans, following the Babylonians, made of day and night, each into twelve equal parts, called hours,)from three o'clock Saturday afternoon; “el tota dii sequenti usque ad diem Bunco" that is, until midnight of Sunduy, or as some have supposed, until daylight of Monday.
Saxon Laws, preceding the Confessor. In the laws of Edgar, tenth century, fo. 78, is an injunction that the Lord’s day *494 should be kept from the third hour, afternoon of Saturday, till daylight of Monday; and that other days, festival and fast, should be observed, which might be proclaimed by the Priest. The same is repeated in the laws of Canute, fo. 99.
In the customs of Normandy, (received by Duke William from King Edward the Confessor, as in the beginning of their old Customary may be seen,) amongst the times defended by the church, against the intrusion of the law, are the days of every week, from the ninth hour of Thursday, until sunrise of Monday. Friday and Saturday were made fast days by the Latin church. — Dugdale’s Orig. Jurid. 90, ch. 32.
By the canon law, against which a partial dispensation was obtained, by the Stat. West. 1, it was enjoined “ut dies dominica a vespera usque in vesperam servetur.n(f)
We find, however, from Keilway’s Rep. fol. 75, that in the 21st year of Henry 7, (two centuries after the Stat. of West. 1.) in the case of a condition to be performed citra festum Sancti Johannis, it was a question when the feast began, whether at noon of the vigil, or at midnight, or at sunrise. Frowike, C. J. of C. P. s.úd, “ The feast in our law, commences in the morning, and ends at night; and the natural day begins ad *495 ortum solis, and ends ad occasum solis, and so is taken and adjudged in our law; but the feast by the law of the church, ^ commences at noon in the vigil, and continues till the next day at midnight.” The law which thus confined a festival to the day marked by the presence of the sun, embraced Sundays, for universally before the time of Elizabeth, Sundays were included in festis deibus; and the change, if change there has been, shows the plastic nature of the common law.(g)
The common law measure of a festival applied to the subject in hand, would authorize a Court restrained by com *496 mon law from sitting on Sunday, to do what any Parliament, Legislature, Convention, Board of Directors, and other body keeping a journal, is accustomed to do — enter on the journal of a day’s proceedings every transaction begun or continued on that day, and prosecuted to a termination before sunrise of the next day. Courts, too, ordinarily adopt this practice without hesitation. As to a trial terminated in the course of Monday night, or other week-day night, no inquiry is made about midnight, but entire satisfaction is given by the remark that the whole term is but one day. And when midnight of Saturday is to be made so essentially important, it is worthy of inquiry how it shall be ascertained. It is only the middle point between one mid-day and another. It is marked by no visible phenomenon, and without the aid of some' chronometer, or of previous calculations made in reference to the sun, it could not, by any skill of the astronomer, be ascertained with positive exactness. Shall a town clock be taken as the standard, whether it be right or wrong, or shall proofs be listened to that it is irregular, or has been tampered with by a party in interest ? When the very moment is to be made the separating line between the highest efficacy and the utter invalidity of the same act, according as it should be done on one or the other side of the line, it might be a question whether mean or apparent time should be looked to; or if the former, whether the first or the last stroke of the clock announcing twelve should be decisive. A case might even occur, where the jury being ready to render a verdict, the clerk should be arrested in calling over their names, or in the very act of publishing the verdict, by the solemn sound which would compel adjournment of the Court, and all the evils and inconveniences which must result from the publication being left incomplete — and this to save from profanation a day, of which less would be occupied by going on, than by the unusual orders which stopping would render necessary. Such a scrupulous regard for the very moment, seems akin to the pharisaical superstition, against which early canons (h) and the leaders (i) of the Reformation directed their anathemas; and it is inconsistent with the manly common sense which has ever been the genius of the common law. If, in disregard of clocks and watches, the judge shall be held competent to pronounce, infallibly, when midnight has come — (k) upon the supposition of an essential difference between two times separated by an undistinguishable moment — he is bound, in the faithful discharge of his duty, to *497 pronounce truly, according to the best evidence afforded to him, and the same state of things we have before imagined may result; or if a exception to depart from the truth be given to him, the course of nature could not be controlled by his opinion, and wrong might be done to conscience and to law. But the reference to midnight, itself shews that the exact time when the day set apart for rest and religious duties shall commence, was here fixed only by human laws, and that no essential difference is supposed to exist between two adjoining moments; and the question here, is not what does conscience or divine law require of individuals, not what suspension of business should a Court allow in the exercise of a sound discretion, but what is the time to which the common law prohibition of legal proceedings upon Sunday, under penalty of entire invalidity, extends. If it begins at midnight, then, as a matter of expediency and propriety, either, (in order to allow suitable preparations to be made for the important moment of midnight) no business should be commenced Saturday evening, or at any previous time, which is likely to last nearly till midnight of Saturday, and,, in all cases, an earlier hour of adjournment should be enforced ; — or a larger discretion should be understood to belong to the Judge, under which, (whenever circumstances, might require, and it could be done without violating rights of conscience) he should, in determining when midnight has arrived, make liberal allowance, even to the extent of delaying until daylight has convinced him of the approach of another day. The common law measure of a festival, as expounded by Chief Justice Frowike, supplies the rule, however, unless it has been changed. Considering, as we now use the common law on the subject, all supposition of change by statute is excluded — how or when, then, has a change been effected ? The civil day, in the time of Henry 7, begun when it now does, but when the law extended its aid to the church, in respect to religious observances, it recognized as a festival only the visible and indisputable day.
5. In support of the verdict now under consideration, it has been further urged, that the common law does not forbid the mere sitting of a Court on Sunday, but forbids the rendering of judgment or awarding of judicial process, or doing of other judicial act, and that the receiving of a verdict is only terial, and not within the prohibition. This view is sustained by the case of Hoghtaling v. Osborne, (in conformity with which a statute of New York has since been- enacted,) the case of Baxter v. the People, 3 Gilman’s Ill. R. 385 — . Earl’s case, and other American cases.(1) All of these depend finally upon the case of Bedoe v. Alpe, Sir W. Jones’s 156, Temp. Jac. 1. There the plaintiff exhibited an infor-matron in the Court of Exchequer against the defendant, for *498 engrossing butter contrary to a Slat, of Ed. 6. The defend-* ant pleaded not guilty, and was found guilty ; judgment was rendered against him, and upon a writ of error in the Exchequer chamber, it was referred to Judges Hutton and Jones. Divers exceptions were taken, the first of which was, that the information was exhibited on 13th October, which, in that year, was Sunday, and so dies non juridicus. But it was resolved by Hutton and Jones, “ that it was good, for although Sunday was not dies juridicus for award of any judicial process, or to make entry of a judgment of record, yet it was good for accepting ail information upon a special-law. And many precedents were shown that such informations were exhibited upon Sunday, and good.”
Now, giving to this resolution of Hutton and Jones the fullest effect which the opinion of the senior Judges should have, T am not sufficiently informed of the nature of an information under a special law, to say whether it should be considered as a proceeding between parties, or whether the - exhibiting of it must be supposed to have been done in open Court, or what effect the subsequent plea and judgment may have had-upon any irregularity in its inception. When we look to the words of the Imperial Constitutions,^) of the Canonsi(w') a°d of the law of Edward the Confessor,(o) concerning prohibition of legal proceedings on certain days, we see -that in all of these (said to be written evidences of the common law on the subject,) all'holding of secular pleas, all forensic disputation, all agitation of law suits, all inquiry by oath, are absolutely forbidden ; and when we look to the adjudged cases concerning the Courts of Law at Westminster, we see that the making of a proclamation,^?) and the filingof a plea in a public office,(q).(which by fiction merely is supposed t0 °Pen C'ourt>) upon a prohibited day, annuls the whole subsequent proceedings. I think we cannot but conclude, that in a Court -to which the prohibition extends, any step taken, or any act done, in a cause pending in that Court, which by law must be done in open Court, is prohibited. There are, to be sure, many acts of a ministerial character that may be done in Court. Not to speak of an original writ or patent, signed by the Chancellor on Sunday,(r) nor of the Treasurer and Barons holding the exchequer for revenue pnrposes(s) — for these are not acts done in Court — we have geen tjiat even those who say a County Court could not try causes at Christmas, admit that it might be held for election of knights of the shire ;(i) that justifying bail or other act not .prohibited by statute, that may be done at a Judge’s chamber, is good ■ on a dies non ;(u) and I doubt not that a Cour' held to a term which excluded Sunday, might, on that dayj without fear of its acts being held void, do acts -.which form ed no step in the progress of a lawsuit, but yet were, by law- *499 required to be done in open Court. But if nothing but the entry of judgment of record, or the award of judicial process, be forbidden, and therefore a verdict may be received and published, the inquiry would be, what might not be done 1 The recording of the verdict, after the order for recording has been given, is unimportant; that is only the clerk’s registration of what took place, and may be made at any time after the adjournment of Court. If the verdict has been received and,.published, no more is necessary to the final adjudication of the case. The subsequent entry of judgment and process of execution may be had at any time in the succeeding vacation.; by fiction, are supposed to be the acts of the Court, and to relate to the term,(w) but in reality, without any thing done or said in Court, follow, of course., the publishing of the verdict — which act includes arid awards them. The whole .previous trial of facts by witnesses before si jury, might be said more expressly to contradict the provision, that no' one should be called adjusjurandum, but would not be technically a judicial act, so decisive as the receiving a verdict, publishing it, and ordering it to be recorded. No difference is perceived between that, and the rendering of judgment upon demurrer after hearing argument. Both are permissible on Sunday, under a rule which holds only the act of recording, in the formal entry of final judgment, to be forbidden.
Of the deliberations of the jury, nothing is said ; because they, like the recording of a verdiet, are not acts necessarily required to be done in open Court, as the publishing of a verdict is.
6. In support o-f the yerdict, it is further urged, that the receiving and publishing of jt, under the circumstances that existed, fell within those exceptions in behalf of works of necessity and of mercy which attach to all sabbatical regula* tions. In the Constitutions of Constantine are express exceptions in behalf of certain legal proceedings, which were considered to be entitled to peculiar favor, from their benevolent nature ; and similar exceptions existed in the more an.cient Homan laws, de Feriis.{w) The Theodosian and .Jústi-.man codes repeated and enlarged these exceptions. The •canon law prohibited secular labor or pleas on the Lord’s ■day and other great festivals, unless “ necessitas urgeat vel pietas suadeatP And a maxim of the common law stands as preamble and reason for the Stat. West. 1 — “ sumna cha-ritas est facerejustitiam singulis in omni tempore, quando opus fuer it ?'{x)
In conformity with the principle of all these, we find various decisions made in England, in reference to statute regulations, which are, in their nature, more inflexible than the common law.
2 Bulst. 72, Temp. Jac. 1. A Statute of Richard 2 provi *500 ded against arrests in time of divine service; Croke, Ch. J. jle|(d) that matters of necessity may be done on Sunday, and ' an arrest for debt, where the debt would otherwise have been lost, was good.
Waite v. Hundred of Stoke :■ Robbery upon one who was travelling during divine service — the Hundred held liable for n0[ producing the robber — “for pursuing felons on Sunday is no offence, but a good work of charity and justice.”
The Stat. of 29 Ch. 2 does not, by its general words, take away the serving of a citation from the spiritual court by publication at the church door on Sunday — “ because it cannot be done as well on any other day of the week.”
Sandeman v. Breach. The owner of a stage coach, on the ground of public utility or necessity, is not included in the-prohibition of the Stat. 29 Ch. 2, which forbade all tradesmen, laborers, and other persons, from pursuing their worldly calling on the Lord’s day.
In the case before us, it now see-ms charity to save the parties from the trouble and expense of another trial; but the question is, what should have been done on the circuit? It was then charity to the jurors to receive and publish their •verdict when they were ready to present it. Their cjuty was done, why should they have been punished ? If the observance of the Lord’s day by them was looked to, it was surely better to permit them to be at home, to take their natural rest, and to join in public worship if they would, than to lock them up during the Sunday, uncomfortable, dissatisfied, and ill suited to each other, as they probably would have been. If only this alternative was presented, there is hardly room- for doubt. Under another head, I will discuss the expedient of allowing the jury to separate at midnight, before they have agreed upon the verdict, and requiring them to return- on Monday and resume the consideration of the case.— Here I conclude, that a construction of the law which would compel; a Judge to adjourn the Court at midnight, and confine the jury until Monday, when, before the crowd, or even he himself, had left the court-room, the case might be terminated and relief given to all concerned in it, by his doing an act short and formal, consistent with the thoughts then most likely to fill his mind; or which af any time during the Sunday would prohibit him from suspending his own devotions for a few minutes to save at least twelve, and probably more, of his fellow-men, from suffering and temptation, would increase the profanation it might be designed to prevent, injure the cause of religion, and bring reproach upon the institutions of the country. Such a construction, our neighbors of Georgia do not give to the common law; for there, as I have been informed, a Judge on circuit, at mid-day of Sunday, receives a verdict and discharges ajury.(^) An English Judge, *501 too, accommodates his respect for Sunday to the demands of necessity and mercy. I have before me an English newspa-1 per, from which it appears that in August last, at the Shrews-bury assizes, in the BirJgeworth murder case, Regina v. Mercy Newton, before Mr. Baron Rolfe, the jury being in deliberation on Sunday, one of the jurors was taken ill, the Court met and the jury were discharged. Next day, prisoner not being, ready lor another trial, an entry or what had taken place was made on the record. " His Lordship observed, that though it was not in modern times the practice to sit on Sundays, yet he had no doubt that, in a case of necessity like this, it was perfectly competent to hold sittings on Sunday. He remarked, that some years back, ,a question was made as to whether a Court could sit on the Epiphany.” The prisoner was remanded, and .the trial .postponed till the Spring assizes.
Even legislative wisdom, from a conviction of the propriety of allowing great .utility to constitute the necessity which should excuse a violation of the Sabbath, has relaxed its restrictions in a point where Courts were insufficient to do so. The Stat. 5 Aun, c. 9, in 1706, allowed the arrest of persons on Sunday, under an escape warrant. This Statute was made of force here, and has been in effect repeated in the Sheriff’s Act of 1839, 11 Stat. 31. It is the only one of all the English Statutes I have mentioned, that ever was of .force in South Carolina.
7. So far, this subject has been considered as if ,it related to the sitting of an English Court, not bound .by.the at Westminster, nor by an.y regulation independent .of .common law. It is -material now to examine any influence our own legislation, customs, ’ and decisions may have had oil it.
The settlement of South Carolina commenced in the days when the cry of no Popery was familiar in Great Britain— The settlers brought a common law with them, and soon, by regulations of the Proprietors and Acts of the Provincial Assembly, legislation was-begun for providing a system adapted to their peculiar situation. In 1704, religious worship was established according to the ritual of the Church of England, with peculiar provisions for support of the clergy and administration of ecclesiastical affairs ; which system, after .re-enactment in 1706, and various subsequent amendments, continued of force till the Revolution. In 1712, by Act Assembly, such English Statutes as were thought suitable, were made of force here, and all and every part of the common law of England, was made of force, with some exceptions; amongst which is the exception of so'much relating to matters ecclesiastical as was inconsistent with the settle *502 ment of the Church of England, which had been made by the Provincial
The Constitution of 1778, Art. 38, gave almost universal toleration, but declared the Christian Protestant religion to be the established religion of the State, and prescribed some general tenets of faith for its ministers. The Constitution of 1790, Art. 8, allows the “ free exercise and enjoyment of religious profession and worship, without discrimination or preference, provided that liberty of conscience shall not be so' construed as to excuse acts of licentiousness, or to justify practices inconsistent with the peace or safety of the State.” How Courts or government in general were first organ-*ze(^ l^e ProviHce we cannot now exactly ascertain, for of many proceedings in times of the Proprietors, records are not preserved. (y) Of the earliest Acts of the Provincial Legislature, only the titles now remain; and the very first of these (No 1 of the titles contained in Trott’s Laws, which are copied by Judge Grimke, P. L. v. 2 Stat. v.) was in 1682, “An Act for the observation of the Lord’s day.” What1 contained we can only conjecture; but as it followed shortly after the Stat. 29 Chs. 2, we may readily suppose that it was in the same spirit. In 1691 was passed another Act, “for the better observance of the Lord’s day, commonly called Sunday,” — which prohibited ordinary work, dressing of meat and selling .of milk excepted. In 1712, a third Act was passed “ for the better observance of the Lord’s day, commonly called Sunday,” of which the first section is copied from L Eliz. c. 2, and much of the remainder from 29-Chs. 2*. It prohibits ordinary labour, and' makes void any service or execution of writ or process, with the usual exceptions ; — the 12th section provides that any person unlawfully arrested on Sunday, may be discharged by the-Chief Justice of the Province, immediately — thus contemplating, judicial action by him on Sunday if necessary, but not in Court. This Act remains unrepealed, and no other Act for observance of Sunday has been-passed. The Stat. of 5. and 6 Ed. 6, never was made of force, nor the Stat. West. 1, c. 51. Nor was any other Statute ever made of force or enacted, which established holidays, (besides Sundays) or required or authorized their observance- — except the reference to the Book of Cbmmon Prayer and’ to Easter, which are contained Hi'the Acts for the establishment of religious worship in the-’Province; and except Acts («) which, in requiring of various. public officers constant attendance in their offices, have excepted Sundays, Christmas-day, and the fourth day of July,” to whieh, on one occasion; have been added “ other publie holidays” — meaning, I suppose, other holidays prescribed by some public authority.
No Act has ever mentioned Courts in common with the- *503 observance of Sunday, or any other day, except that Sundays have, sometimes, been excepted from the days appointed to constitute the terms of Courts. (act) The Terms at Westminster have never been observed here. For most Courts terms have been prescribed at their various places of sitting, and at different periods of our history these terms have occupied all seasons of the year, without distinction. What may have been the usage of Courts before the Revolution, as to the higher church festivals, not Sundays, (formerly more regarded than_now) I am not informed; but it is certain, that neither Holy Thursday nor Candlemas was ever regarded with any special reverence, and that many of the other days mentioned in the Stat. of Ed. 6, were wholly unnoticed. It may be safely assumed, that no Court has ever been held in the day time of Sunday, and, probably, the same may be said of Christmas day, and, since the Revolution, of the fourth of July. Of late, when Good Friday falls within a term, sometimes the Court in Charleston adjourns, in the exercise of its discretion, and sometimes it does not; in other parts of the State, that day is not at all observed ; and nowhere (besides that day and Sundays) is any day in Lent, Easter-week, the week Of Penticost, or Advent, made a holiday in Court.
Under these circumstances, what common law, as to unju-dicial days, prevails here? No one would admit that, in default of all statutory regulation, we are remitted to the Law of the Confessor, or to the Canon expounded by Britton, or to that as amended by Stat. West. 1. The colonists of South Carolina, no doubt, felt the influence of the Statutes, new customs and altered opinions which, in England, had. folloAved the Reformation and the other great changes that took place before, the beginning of the eighteenth century. In their reverence for the Lord’s day, they had ceased to place any other festival or holiday on the same footing. It seems probable that the law upon the subject, which was really received and acted on in the Province, was not the common law, as that had at any time existed in England, but a law, mixed of common law and statutes never of force here, accommodated to the religious opinion which prevailed, and sanctioned by observance, without inquiry as to its origin or exact extent. The maxim, dies dominicus non est dies ju-ridicus, seen in every book of practice, and by its very jingle impressed upon the memory, was taken for an inflexible rule, and all other dies non forgotten. The statutory enactments against service or -execution of writ or process, were confounded with the common law prohibition of judicial proceedings, and the universal reverence for the Christian Sabbath prevented all occasion for nice investigations concern *504 ing the restraint upon the Courts, or the exceptions which, it ^ admitted. '
^ ' Is the retention of Sunday, when all the other dies non juridici were rejected, a remnant of ancient law which was preserved, or a new usage which was introduced ? Was the observance of Sunday, by the Courts, a matter of discretion safely entrusted to those who were appointed to exercise the judicial function — never violated, because violation without necessity was never contemplated, and never would have been borne ; or was it a matter enforced by 'stern and positive prohibitions, under penalty of the entire invalidity of all proceedings contrary to it — totally different from the discretionary observance of Christmas or the fourth of July ? If .positive law made judicial proceedings on Sunday, and Sun.day alone, void, was the Sunday thus protected the civil day, beginning at midnight, or the festival ab ortu ad occasum soils, or the day beginning at the end of the Jewish Sabbath? Were-exceptions admitted, which necessity, great utility, mercy and charity, required ?
If it be resolved that judicial proceedings on Sunday are here prohibited, either by the common law of England, or by custom of our own in analogy to the common law, then the exceptions which the common law admitted, and the length, of time which it defended, prevail here, either by common law, or in analogy to it.
As to the exceptions, they are inherent in the very nature of sabbatical institutions, and Christians have rested their acknowledgment of them upon the example and precepts which the Great Head of the Christian Church gave in rela-^on t0 ^ Jewish Sabbath. (66) That institution formed of a system, under which the civil and ecclesiastical forum were identical, and before that forum, in the positiveness of the law which established it, the severity of the pen-Prided for its violation, (cc} and the rigor of formality expected in its observance, differed much from the weekly commemoration of the Resurrection, which has been substituted in its stead, when this latter claims the notice of civil Courts, before which, Church and State must be held wholly distinct. The exceptions which the former admitted, the latter surely did not exclude^.
As to the length of time, its beginning and end, it has been urged that our usage has made the Sunday conformable to the civil day; but on this point, the distinction must be kept in mind, between usage depending upon statutes which, when they mention Sunday or other day, without explanation, mean a civil day, and usage applicable to a subject of which our Statutes have never treated. Concerning the latter, in aid of the application to it of the common jaw measure of a festival, much effect must be given to the *505 universal toleration which our constitution establishes. Not that it is supposed there is any unconstitutionality in enforc-v ing here, by law, a day of rest, if no religious faith or worship be enjoined; but that a spirit of forbearance and conciliation should guide decisions, where private opinion is most impatient of the restraints of law, and where, in the absence of positive law and the search for regulation in uncertain usage, there must, necessarily, be much latitude of discretion. In the Connecticut case before cited, some of the Judges remarked that confirmation of the construction which they gave to their Statute was to be found in the requirements of universal toleration, amidst the diversity of opinions which prevails amongst Christians, about the proper evening to be kept as part of their sabbath. Supposing all Christians to agree that a whole seventh of time should be kept, and that the day-time of Sunday should constitute a part of this seventh, for the differences between them, as to what should be added to this day-time, it was in that case thought wise for the law to embrace in its penal enactments only the period of agreement, and to leave to liberty of conscience the remainder of the holy season.
The reasoning and course thus approved, let it be remarked in reference to the case now in hand, would not sustain a law commanding that a Court should sit Saturday night or Sunday night; for general toleration would require that, from a command to do acts in violation of a Sabbath, should be exempted the whole time from sunset of Saturday till sunrise of Monday, and (to embrace Jews and seventh day Christians) even the time from sunset of Friday. But between a command to do, and an omission to prohibit, there is a wide difference. Where a distinction is allowed which shall respect all tenderness of conscience, must a proceeding, had without offence to any one, be void, because it took place upon the Sabbath kept by some Christians, although the Sabbath of a second sect of Christians may not have begun, and like proceedings have been had an hour before, in disregard of the Sabbath of a third sect ?
These observations would lead to the conclusion that the common law which here makes void judicial proceedings on Sunday, does not rest upon indubitable history, is not clearly defined, and may well be held to comprehend only the day time; but against all this is urged the case of McCombs v. Shaw, decided by Judges Burke, Grimke, Waties and Bay, at Charleston, in 1799.
The report of that case has produced decisions conformable to it in this State and others; the abstract of it is conspicuous in digests ; and it no doubt has had much influence upon the opinion of the profession and practice of the Courts, and is the strongest evidence which can be adduced of usage as the basis of a common law rule made for ourselves. At *506 the time that case was decided, no opinions were written by the Judges. About twelve years afterwards, the venerable reporter, Judge Bay, published the volume which contains the case, from notes which he had kept. In the results of cases, his reports are, usually, accurate; but the reasons of decisions are given always in his own language, aud may well be supposed, when he speaks for the whole Court without distinction, to present merely his own views.
Laying out of consideration the excess of damages and misconduct of jurors complained of, the report itself leaves it uncertain whether the ground of decision was, that the verdict was rendered after the expiration of the term, or that it was rendered after midnight Saturday, at a time which was before the expiration of the term, but unjudicial because Sunday. I have examined the original minutes of the Court at Cambridge, now preserved at Abbeville. I find that, in 1798-9, the Court, at Cambridge was, under an Act of 1791, directed to be held every 16th day of November and 18th day of April, with exception of Sundays, and to sit from day to day, not exceeding ten days, if the business was not sooner finished; not, as the report states, “ 16th day of April and November in each year, to sit for ten days, or until the business was finished.” In April, 1798, the Court met on Wednesday the 18th, Judge Grimke presiding. Inthe minutes of Saturday, the 28th, is the verdict in McCombs v. Shaw, $1000 for plaintiff, aud after it are two orders of Court before entry of the adjournment. Saturday, it will be seen,, was the tenth and last day of the Term, excluding Sunday, the22d. After the order for new trial, the case was tried again oh Thursday, 25th of April, 1799, and a verdict was rendered of one shilling for the plaintiff.
It will thus be perceived that, besides being inaccurate in saying that, by the common law, all temporal business transacted on Sunday is void, the reporter has misplaced all the observations made in that case about dies dominicus ; for the result (if the Clerk’s certificate should have been taken as evidence of the time when the verdict was received) must have been just the same if the verdict had been rendered Saturday morning, and Friday had been the last day of the term prescribed by Statute. I think there is also cause to suspect that the complaint made about the excess of damages, found by the first verdict, was not unworthy of attention; and that in the phrase ten days, used in the Statute fixing the term of the court, is to be found a reason for looking to midnight, which does not apply to a common law festival, or to a Sunday established in law by the usage of various sects of Christians.
The case of the State v. McLemore has been also cited to show that a verdict cannot be made one minute after 12 *507 ©’clock Saturday night. It really decides only that a jury having a case under consideration must be discharged at the end of the term; and that a prisoner, indicted of a capital offence, whose case was under consideration when a jury was thus discharged, may be remanded and tried at another term. In 1835, when that case was first heard on circuit, the Court for Richland District, in which it occurred, was, by an Act of 1828, (pamp.. 14, not in the Stat. at Large,) directed to commence on Monday and be held for two weeks. Without any exact inquiry as to the meaning of a week, it was taken for granted on the circuit and in the Court of Appeals, that Saturday, of the second week, was the last day of the term, and upon that assumption it was held that at the end of that day the power of the Judge to detain the jury, and of the jury to render a verdict, ceased; and the case, not having been tried, stood over for the next term. The question, of Sunday was not at all considered in the case. Perhaps a careful examination of the various Acts of the Legislature, by which, at different periods, the sittings of the courts have been regulated, might have raised doubts whether the term of two weeks did not embrace fourteen days, of which Monday was the first; but this could hardly have affected the result of the case, for even if proceedings on the fourteenth day might not have been void by law, it could not well have been considered an illegal exercise of discretion for the Judge to adjourn, in conformity with the established opinions and settled usage of the community.
8. I think that art examination- of our Statutes would, show that the day on which the verdict in the case now under consideration was received, (even admitting it to have been Sunday at noon,) being within the term of two weeks, which, without exception of any days, is, by the Act of 1845 (11 Stat. 316) prescribed for Richland District, was, by Act of the Legislature, a judicial day,’whatever may have been the common law on the subject; not that I suppose the Legislature has commanded or contemplated the ordinary sitting of a court on Sunday, but that 1 find the legislative will expressed in- terms which plainly import, according to the established canons of interpretation, that judicial business is authorized during the whole of a term which includes Sunday; and I receive this expression as a removal of prohibitions and penalties, which at least would justify proceedings on Sunday in cases of strong necessity, in the exercise of a sound discretion' that would do violence to ne conscience and-encounter no’ prejudice. As a judge would dispense with dbys-in his term,, when any great calamity or national festival engaged the public mind, so would he with a- day set apart-for religious ob- ' serva-aces by most of the suitors of his court. But a judicial *508 proceeding, to which imperious duty might urge him in the one caS6) woui¿ be no more void than in the other.
It would be intolerably tedious to point out the various passages in our Acts, many of them carelessly penned, which have brought me to this conclusion. I will only indicate the course that may be pursued by an enquirer, and the results that may be attained. In the 7th volume of our Statutes at Large, under the head of Courts, may be found most, but unfortunately, not all, of our Acts, which at different times regulated the sittings of our courts prior to 1839. Various modes have been adopted in prescribing the terms, during which courts for the different districts should be held.
First. A certain day of the month has been appointed for the beginning of a court, and a certain number of days prescribed for its sitting, sometimes with (cc) and sometimes without (dd) a provision that if the appointed day should be Sunday, the next day should be the first.
Second. The districts composing a circuit have been named successively, and it has been directed that the court for the first shall be held the first Monday, for the second the second Monday, and so on; no other limit being assigned than that which results from the necessity of the Judge’s leaving one p]ace be at another, (ee)
Third. The day of the week, usually Monday, on which the court for each district shall begin to be holden, has been and directions given that the court shall sit a certain number of days, of which the last is usually Saturday, (ff)
Fourth. A certain day of the week, usually Monday, has heen appointed for the beginning, and directions given that the court shall sit for one week, (gg) for two weeks, (M) and sometimes for more.(ii) This fourth has been the mode usually pursued since 1828.
Sometimes Sundays have been specially excepted, when the aPP0intment has been such that a Sunday might be in-eluded, (IcJc) and sometimes not. (II)
Sometimes the phrase judicial days has been employ-ec[. imm\ once that of court days (nn) — intended, no doubt, to exclude Sundays.
Sometimes the phrase de die in diem, or that of day by day, has been employed, with (oo) or without(pp) exclusion of Sun-days-
Now, when I find the exception of Sunday introduced into one Act, and omitted'in another, I cannot but conclude that the omission was intentional, and that the exception does not exist under the latter Act. When I find a court directed at one period to sit six days, and at another to sit a week, I infer that a change was made. When I see a sitting prescribed-de die in diem for fifteen days, I discover for that sitting an abrogation of any maxim that before made days unjudicial.
In the Judicature Act of 1799 v(7 Stat. .291) clause 11th is *509 this: “If the day appointed by law for the holding and sitting of either of the district courts of this State should happen to be on Sunday, then such court shall be holden and sit on the day following.” This clause I think was intended to meet the special provisions which in that Act, and the one of 1798, of which it was an amendment, had been made for the sitting of the courts for Georgetown, Colleton, and Beaufort districts, to begin on certain days of a month and continue five or six days, whilst in other districts the beginning was appointed to be on Monday. But if it was intended to be a permanent and general regulation, to which subsequent Acts, not repugnant, should be conformed, it shows that when there are no exceptions made, Sunday, if falling within a term, is a “day appointed by law for the holding and sitting of courts and a subsequent law which so appoints Sunday, but forbids the sitting on the next day, by making Sunday the last day of the term, rather admits the sitting on that day, than malees an appointment, which the clause is effectual to revoke without giving the contemplated substitute.
It remains only to consider the Act of 1818, (qq) and to say, such is the diversity of human minds, and such the *510 difference of views which may be taken on the same subject, that this Act, acknowledged on both sides to be very material, 'is relied upon with confidence on either side of the question before us.
It must be premised that by the Acts of 1798 and 1799, the court for any district of the State was required to sit either five or six days, except Charleston, and there for five weeks; and 48 jurors, from whom tw© petit juries might be formed; were directed to be drawn for the whole term of every district, including Charleston. In 1804,‘“An Act to relieve the inhabitants of Charleston district frem the unequal duty of serving on juries, and to make their duty uniform with that of the citizens of other districts’’ was passed. In it may be noticed a confusion between “six days” and “a week,” produced by the attempt to render each week of the Charleston term equivalent to the whole term of another district; and it may be seen that tfie Act of 1818, above cited, uses only the term one week, thus misreciting the Act of 1804.
The preamble of the Act of 1818 clearly sets forth the mis-chiefs to be remedied — mis-trials in important cases, and great delays and injustice consequent thereon. Its remedy is that the jury empannelled and charged with an issue, which remains undecided at the expiration of the jury’s term, (if the 4erm of the court has not expired) shall not be discharged. The course which it directs to be taken is that the Judge shall adjourn the jury to the ensuing week, “in like manner as juries are adjourned from day to day’’ and that the jury shall, at the time appointed, attend and resume the consideration of ¡the issue, &c. The third section applies the provisions to every other district in which courts shall be held for more than a week at one term. In reference to this section, let it be -observed that the Act of 1804 was never applicable to any district but Charleston ; and by the words of the Act of 1845, .(under which the court for Richland, sat when the verdict in question was rendered)Jurors, drawn for each week according •to the directions of previous Acts, were bound to appear and *511 attend at the court held according to the provisions of the Act of 1845.
Now, the first section of the Act of 1818, so far as concerns ■a case with which the jury have been charged, (that is, in which the jury have been sworn — which has been opened to the jury — or upon the consideration or examination of which the jury have entered,) is a repeal of the Act of 1804, and a negation of the right of the jury to claim discharge, if not of the right of the judge to arrest the trial by discharging them. If the case has not progressed so far that the jury have retired from the bar to consider of their verdict, plainly the course directed is for the Judge, at or before the end of the jury’s term, to adjourn them to a time in the next week, in conformity with the practice long known in this State (and said to be almost peculiar to this State,) of usually permitting jurors, in any case, civil or criminal, at any stage before they retire to consider of their verdict, to separate at every recess or adjournment of the court. But if the jury have retired, and the time for which the jurors were summoned expires whilst they are in confinement, what shall be done? They shall be adjourned “in like manner as juries are adjourned from day to day.” According to the mode pursued in adjournments from ■day to day, if a jury be in confinement wheri the Judge leaves court, a Constable is sworn “to keep the jurors confined— neither to suffer any other person to speak to them, nor -to speak to them himself without leave of the court, except himself to ask if they have agreed upon their verdict.” When informed that the verdict is ready, the Judge, at his earliest convenience, comes into court and receives it.
The entire seclusion of the jury from all other persons, after their leaving the bar until they have agreed upon their verdict, is an incident of jury trial well established in the common law; laid down by sages of the highest authority, and in many instances made the foundation of decision and practice.(rr) No evidence can be received by a jury except in open court, where it may be searched into, discussed and examined ; no argument can be addressed to the jury, upon which there is no chance for instruction from the bench. A verdict will be set aside if, after the jury have left the bar, they send for a witness and hear repeated the testimony he gave before ; if any one in behalf of that party in whose favor the verdict is, has delivered a paper to them, or has said to them the case is clear for him ; and, as our case of Cohen v. Robert has lately decided, if there be belaboring or improper interference with a single juror at any time in the progress of the trial, by any person, even if that person be nei *512 ther party nor agent of a party, and although the juror may , not be thereby influenced, if the verdict be such as the interference was calculated to produce.
Contrary-to all this is the suggestion, that the Act of 1818 requires that the jurors, after they have retired and before they have agreed, should be released from their confinement, and for at least twenty-four hours be permitted to remain separate from each other, and out of the observation of the court or any of its officers. Sir Wm. Blackstone, in his Commentaries, says,' “ a privy verdict is of no force, unless after-wards it be affirmed by a public verdict given openly in court, wherein the jury may, if they please, vary from their privy verdict; so that the privy,verdict is indeed a mere nullity ; and yet it is a dangerous practice, allowing time for the parlies to tamper with the jury, and therefore very seldom indulged.” How much more dangerous would be the separation of the jurors before they have attained a result to which they are pledged by agreement, after individual opinions have been ascertained, and whilst in their-bosoms the heat of altercation is still glowing ! In this condition, brought into the atmosphere of public opinion which surrounds the scene of a great trial, unprotected by either official dignity or habitual caution, many simple hearted jurors would feel the influence of this opinion, insidious and tyrannous as often it is ; the impressions made by the evidence contrary to it would be effaced, misconceptions conformable to it would become unconquerable prejudices, and what, in the struggle of the jury room was only an earnest desire for supposed truth, would be turned into the active zeal of partisanship. But much worse than all this may be imagined, when we think of the views and dispositions of different jurors disclosed to parlies and their friends, and of the means which might be used to confirm support, relax opposition or decide hesitation. It is painful to conceive of the result that might proceed from theopportunityfor management and influence which would be afforded. Our practice shews that unusual confidence is here reposed in the integrity of jurors. That confidence I trust is not often abused, although I fear that it sometimes is. But it is no disparagement of the most intelligent and virtuous community that exists here or elsewhere, to believe that out of twelve men taken by lot from a whole district, at least one may always be found who is either unprincipled or weak enough to yield to the arts which great interests at stake might call into employment. The most exciting and important cases are the very ones upon which juries are most apt to be hung Saturday night; and rather than dispense such justice as the adjournment of juries to Monday is likely to produce, 11 would, if it were necessary thus to satisfy the words of the Act of 1818, hold that an adjournment from one *513 minute before 12 o’clock Saturday night to one minute after, was an adjournment “ to the ensuing Week.” But no such word-catching is necessary. The legislature intended no change in the fundamental principles ofjury trial, as is manifest from another Act on the same subject passsed at the same session, which, in all fairness, should be construed in pari materia. with the aforementioned Act of 1818.
The 8th section of the Act of 1818, concerning the City Court of Charleston, which was intended by the same means to remedy the same mischiefs as the other Act, is in these-words: “ Petit jurors shall be drawn to serve one week, unless they be actually charged with an issue, in which case they shall be adjourned from time to time, or continue to sit? until such issue shall be disposed of.” Here, more plainly than in the other Act, appears the distinction between those-stages of a case which are previous to the retirement of the-jury, at all of which the jury may be. adjourned, and the private consultation of the jury, which must be continuous until it has resulted in a verdict. Here, too,, the- words “ actually charged with an issue,” are equivalent to the words “ empanelled and charged with the trial of any issue, civil or criminal,” which are used in the other Act. Either phrase-comprehends the whole of a jury’s engagement with a cause’,, and to confine either so as to embrace only a jury to whom the charge on final instructions from the bench has been, addressed, would pervert the proper meaning of words, and exclude from the remedy of the Acts cases interrupted by the expiration of the jury’s term in the progress of the testimony or of the argument, in which cases the mischiefs are just as apparent as in the cases that would be included, where the summing up has taken place.-
The adjournment of a jury in the city, where-all the jurors could certainly go home on Sunday, would be morn-convenient than in a country district; but considerations-above mere convenience forbade the adjournment at any place, of a jury, after retirement and before agreement. Since 1818, various cases have occurred in the District Court of Charleston, in which the jury being out at 12 o’clock Saturday night, have been continued in confinement; but no example has yet been given of adjourning their unfinished consultation to another day.
It has been supposed, that the Acts of 1818 must be construed subject to the common law maxim, dies dotninicus non est dies jurídicas. If I have succeeded in conveying my impressions upon some of the other heads which have been discussed, it must appear that, as to the origin of its authority here, its extent, and the consequences of its violation, that maxim, in reference to the sitting of a court, is at least doubtful. The familiar law which secludes the *514 after their retirement from all ont-door influence, is beyond doubt, and to that was the legislation of 1818 intended to ’ be conformable.
If, then, the jury being, out have not agreed when Sunday comes, and (the term still continuing) they ought not to be either discharged or adjourned, what shall be done, when, in the course of Sunday, they are ready to render their verdict ? The Acts of 1818 suggest that the same course should be taken which should be taken on any other day ; but independent of these Acts, charity and necessity authorize the receiving of the verdict, for relief of the jurors.
This court is, therefore, of opinion, that the verdict in this case is not void, and the motion is dismissed.
Richardson, Evans and Frost, 3 J. and Johnston, Dun-kin, Caldwell and Dargan, CC. concurred.
Withers, J.
was absent in Charleston, at the rehearing of this case, and at the decision of it, and therefore gave no opinion.

Motion refused.

APPENDIX.
[Sir Henry Spelman’s Original of the Terms, written in 1614, — (to which reference is constantly made on the subject of dies non juridici,) — is not within my reach. The following extracts from Lord Mansfield’s opinion in Swann v. Broome, with the annotations and references which are subjoined, probably contain much of what would be found in Spelman’s Treatise, and present means of obtaining the history of the English law concerning Sunday.]
Extracts from Swann v. Broome, 3 Burr. 1597.
LORD MAN'S FIELD.
'The single question is whether the Court can sit on a Sunday, and give a valid judgment.
No express direct authority has been cited in proof of the affirmative side of this question. Those authorities that have been urged in support of it have been only argumentative, from, whence such a conclusion might, as it is said, be drawn.
*515 But the history of the law and usage as to Courts of justice sitting on Sundays, makes an end of the question. v
Anciently, the Courts of justice did sit on Sundays. (A)
The fact of this and the reasons of it appear in Sir Henry Spel-man’s Original of the Terms.
It appears, by what he says, that the aneient Christians practised this. In his chapter of law-days, concerning the first Christians using all times alike, he says : i; The Christians at first used all days alike for hearing of causes, not sparing (as it seemeth) the Sunday itself.” They had two reasons for it. One was in opposition to the •heathens, who were superstitious about the observation of days and times, conceiving some to he ominous and unlucky, and others to be lucky; and therefore the Christians laid aside all observance of days. A second reason they also had-, which was, by keeping their own Courts always opm, to prevent Christian suitors from resorting to the heathen courts. (B)
(A.) IWb. Bla. 499. Lord Mansfield: “Can it be supposed tlrattheoourt did not sit on Sunday, when the terms were first framed, and so many returns were made on Sunday I”
After the general conversion of the Anglo Saxons to Christianity there must have been amongst them an observance of the great .festivals of the church.— The terms are supposed to have had origin in or before the time of Alfred, and •to have been arranged so as to avoid the principal seasons of religious solemnity, and tiróse when-the husbandman was most busy. If afterwards the courts sat on Sunday, less attention was paid to that weekly festival — first of all and most universally observed amongst Christians — than to Christmas, Easter and Pentecost, which -were especially excluded from the terms. This could have been only at a very early period. In the league between Edward, the elder, .(son of Alfred) and Guthrum, the Dane, it was ordained, “Festis diebus omnibus et legitimis jejuniis, ordalium (the ordeal by fire or water) nullus ingreditor neve ad jusjurandum addicitor.” (Saxon Laws, fol. 55.) Here Sunday is included in all festival days, and there is a prohibition, either of all legal proceedings, or of certain modes of trial in criminal cases.
The laws of In a, early in the eighth century, also contained provisions of severe punishment for secular labor on the Lord’s day. Saxon laws, fol. 2.
(B.) Before the conversion of Constantine, the church was a distinct society -from the State. For the government of themselves, and to escape the scandal of carrying controversies amongst themselves into a heathen court, the primitive -Christians gave power of judicature to the bishops, whose gravity and wisdom had obtained authority in the church. 2 Bac. Abt. 717. This submission to the bishops, at first voluntary, and after the conversion sanctioned and enforced by the Emperors, was the beginning whence proceeded the association of the Bishops with the Earl in the county courts, and the whole jurisdiction of the ecclesiastical courts in England.
To the time preceding the conversion of Constantine must be referred the usages and reasons spoken of in the text. Constantine (as may be seen in the next note) made imperial constitutions which exempted Sundays and the fifteen *516 days of Paschal solemnity, (other festivals were afterwards added) from forensic litigation; and never afterwards, except a short period in the time-of Julian, the Apostate, were there heathen courts to which Christians could be called under the empire.
If reference is made to the island of Great Britain, .after there were Christian courts there; they were the courts of the State — no heathen courts existed co-temporaneously, and the usage of all Christians-enjoined a special observance of the Lord's day.
(C.) From an imperial constitution- of Constantine: ‘-Sicut indiguissimum videbatur diem solis, venerationis suae celebrem*, alteriantibus jurgiis et noxiis partium eontentionibus occupari, ita gratum ac jueundum est eo die quae sunt máxime votiva (good offices) compleri; atque ideo emancipandi et manumittendi die festo cuncti licentiam habeant, et super his rebus actus non- prohibeantur.” Cod. Theod. Lib. ii. Tit. viii, de Fenis, leg. 1.
“Scaliger, de emended tem/pur, p. 776, mentions a law of Constantine wherein the Paschal weeks, one before and the other after Easter Sunday, are ordered to be days of vacation from all proceedings at law.” Bingham’s Orig, Eccles. 7 vol. of his works, p. 87,227.
Law iff Valentinian, sen: “Die solis qui dudum faustas habetur, neminem íhristianum ab exactoribus volumus conveniri, contra eos, qui id faceré ausi sint, hoc nostri statuti interdicto periculum sancientes.” Cod. Theod. Lib. viii, Tit. viii. - De exsecutoribus leg. 1. Repetitur Lib. xi, Tit. vii. De exactionibus, leg. x.
Law of Valentinian, jun: “Solis die, quern dominieum rite dixere majores, omnium omnino litium-, negotiorum, con-ventionum quieseat intentjo. Debitum publicum privatum ve nullus effiagitet; ne apud ipsos quidem arbitros vel in ju-diciis flagitatos, vel sponte delectas, ulla sit agn-itio jurgiorum. Et non modo notabilis, verum etiam sacrilegus judicetur, qui a sanctee religionis institutio ritu ve deflexerit.” Cod. Theod. Lib. xi, Tit. viii. de exactionibus, Leg. xiii. Re-petitur Lib. viii, T’t. viii. de exsecutoribus Leg. iii.
Law of Valentinian, jun., and Theodosius the Great: “Omnes dies jubemus esse juridicos. Illos tantum manere feriarum dies fas erit — (two months of harvest and vintage — the Mends of January — the natales of Rome and Constantinople — the birthdays of the Emperors — the anniversaries of their inauguration)— sánelos quoque Pascliaj dies, qui septeno vel praecedunt numero, vel sequuntur in eadem observatione numeramus. Nec non et dies solis, qui repetito in se calculo revolvuntur.” Cod. Theod. Lib. ii, Tit. viii, de Feriis, leg. ii.
But in the year 517 a cannon was made : “Quod nullus episco-Vel infra-positus die dominico causas judieare proesumat.” And this canon for exempting Sundays was ratified in the time of Theodosius, who fortified it with an Imperial Constitution. “ Solis die (quem dominieum recte dixere majores) omnium omnino litium et negotiorum quieseat intentio.” The whole cannon is also decreed verbatim in the Capitulars of the Emperors Carolus and Ludovi-cus. (C)
Two laws of Theodosius the Great forbade criminal actions and corporal punishments in Lent. “Ctuadraginta diebus, qui auspicio ceremoniarum Pas-chale tempus anticipant, omnis cognitio inhibeatur criminalium. questionum.”— Cod. Theod. Lib. ix, Tit. xxxv, de GUiestionibus leg. iv. “Saeratis quadragesi- *517 mte diebus nulla supplicia sint corporis, quibus absolutio exspectatur animarum." Ibid, leg. v.
There are likewise several other canons taken notice of in Spel-man’s Original of the Terms. One of them was made in the Ooun- v cil of Tribury, about the year 895: “ Nullus comes, nullusque om-nino secularis, diehus dominicis, vc-1 sanctorum in festis seu quadra-gesimoe aut jejuniorum, plaeitum habere, sed nec populum illo prce- *518 sumat eohereere.” Another of them was made in the Council of Erpford, in the year 932, and afterwards became general, upon being taken into the body of the canon law by Gratian, And Sir Henry Spelman takes it, he says, to be one of the foundation stones to our Terms. “Plaeita seeularia dominicis Tel aliis festis diebus, seu eti-. *519 am in quíbus legitima jejunia eelebrantur, secundum oanonicum in-stitutionem, minime fieri volumus.” It goes on and appoints yaca- ^ tions; but these vacations were enlarged by the Council of St. Me-dard: “Deerevit sancta synodus, ut a quadragesima usque ad oeta-vam Pasehas, et ab adventu Domini usque ad octavam Epiphanias, necnon in jejuniis quatuor temporum, et in litaniis majoribus,' et in diebus dominieiis, et in diebus rogationum (nisi de concordia et pa-cificatione) radius siipra sancta evangelio, jurare- prcesumat.” By which expression is meant, that no causes should be tried or pleas holden on those days.
*517 Honorius made a law adding to the exceptions from the observance of the ferias forenses, the cases against masters of vessels who dealt fraudulently in the transportation of the public corn. Lib. xii, Tit. v, lex. xxxviii; and Hon-orius and Theodosius, jun., added another exception in cases against the Isau-rian pirates. Lib. ix, Tit. xxxv, leg. vii. Another law of Honorius (lib. ix, Tit. iii, leg. i,) required tire Judges to visit the prisons on Sunday, to look to the comfort of the prisoners.
The imperial laws above mentioned (except that for which reference is made to Scaliger) are found in the Theodosian code, which was first promulgated'in the Eastern Empire, A. D. 438, and soon afterwards confirmed in the ’Western Empire, and of which the last of the Novella that were interchanged between the two empires, was in the year 448 before the canon of 517.
The Justinian code (A. D. 529, 534) contains some of the same laws, and some additional ones on the same subject. Lib. iii, c. xii, De Feriis, particularly (leg. viii,) a law of Theodosius, jun., enjoining the stay of all actions public and private, during the Paschal days, except “emancipandi et manumittendi li-centiamleg. vii, alaw of Justinian addingto th e feria forenses before established by Valentinian, jun. and Theodosius the Great, Christmas, Epiphany, Pentecost, and the days of the Passion, of the Apostles; leg. iii, which required judges, people in the city and all artisans to rest, “venerabili die solis,” but permitted husbandmen in the country freely to pursue their agricultural business (which a law of Constantine had also permitted in certain seasons;) and leg. xii, in these strong terms: “Dominicum itaque diem ita semper honorabilem decernimuset, venerandum, ut a cunctis exsequestionibus excusetur: nulla fide jussionis flagite-tur exactio: taceat apparitio: advocado delitescat: sit ille dies a cognitionibus alienus: preeconis hórrida vox silescat: respirint a controversiis litigantes, et ha-beant feederis intervallum, ad sese simul veniant adversarii non timentis, subeat ánimos vicaria pasnitudo,” &c.
See also the Pandects, Lib. ii, Tit. xii, De Feriis, Leg. ii, iii, ix,for exceptions in the heathen laws concerning the feria forenses observed before the time of Constantine, similar to those which were introduced into the constitutions of the Christian Emperors.
That which, in the text, is given as a Canon of 517, that laid the foundation for exempting Sundays from lawsuits, is really no more than the fourth title of the Capitulars of the Council of Tarracon, held A. D. 516. This council was only a Provincial council held in Spain, under Theodoric of the Ostrogoths, then King of Spain and Italy. The prohibition was directed against the clergy only, in reference to the usage already established of their expounding laws and administering justice, except in criminal matters; for, in that age, the decrees of councils derived their chief efficacy from the assent or confirmation of the civil powers; the disobedience even of the clergy was, without the aid of the civil magistrate, subject only to spiritual punishments, and all laws, as well in *518 matters spiritual as in those temporal, which restrained the laity, had the sanction, of the civil authority. The purpose of this capitular was not to restrain the public tribunals, (for over them the council had no jurisdiction, and for them laws already existed under the Empire, and, probably, under the Ostro-goths,) but to prevent the indecency of the clergy’s sanctioning abuses, which the license of the times indulged. The capiiuhim guarlwru, of which the title has been given, is as follows. — 11 Ut nullus episcoporum, aut presbyterorum, vel clericorum die dominico propositum cujuseumque causal.negotium audeat judi-care: nisi ut hoc tantum, ut Deo statuta solemnia peragant. Cretoris vero diebus convenientibus personis, illa quae justa sunt habeant licentiam judicandi, exceptis criminalibus negotiis.” Labbe et Goss. Concil. Tom. iv, p. 1562, 1564
The Council of Mascón was held under Clothaire, in France, A. D. 585.
Canon 1. Directed the keeping of the Lord’s day: forbade the strife of lawsuits, or the pleading of causes, or the making of a necessity for yoking oxen on that day: expected all to be intent in singing hymns and praises to God. “If any one contemn this admonition, he shall be punished according to the quality of his offence. If he be a lawyer, he shall lose his privilege of pleading; if he be a rustic or a slave; lie shall be severely beaten with rods; if a clergyman or monk, he shall be six months suspended from the communion of his brethren.”
Camón II. Required that, in the six most holy days which followed Easter Sunday; no- one should presume to do any servile labor, but, with one consent, all shall attend the service of the Paschal festival, “ vespere, et mane, et meri-die.” Labbe & Goss. Concil. Tom. v. 980-1.
The council of Erpesfust, Germany, was held A. D. 932, present — king Henry.
Capit. II. Forbade the holding of secular pleas on the Lord’s days, the prin-pal1 festivals, or even the lawful fast days : and declared that, for the advancement of religion, the most glorious King Henry had granted that no judicial power-should have license to banish or condemn Christians for seven days before Christmas, and from Guinquagesima to eight days after Easter, and for seven before the nativity of St. John the Baptist; that there may be greater freedom in going to- church and passing the time in prayer. Labb. & Coss. Tom. ix, p. 591.
The foregoing extracts from the proceedings of Councils, are set down in the Decretnm Graliani, pars ii, Causa xv, Guest, iv, p. 1172, except that, in the last extract, instead of the words italicised, it is said “the holy Synod hath decreed to the days enumerated are added, “ from Christmas to the octave of Epiphany and the whole of the days enumerated are introduced as “supradictis diebus, id est” — shewing that they include all of the principal festivals and fast days.
Beside8 the canons mentioned in the text and in this note, many other canons,. mostly of French and Spanish Councils, may be found forbidding the violation of the Lord’s day, especially by the working at husbandry, which Constantine *519 and the Justinian Code had permitted, but the Church never well approved. A new canon on the subject was not evidence that no law before existed, but only that former laws had been ineffectual.
These canons were received and adopted by our Saxon Kings.' (D) And Edward the Confessor (E) made the following Constitution: *520 k Ab Adventu Domini usque ad octabas Epiphanice, pax Dei et sane- *521 tse ecclesia/(F) per omne regnitm; similiter a Septraagesima'usque ad oetabas Pascbas; item ab Ascensione Domini usque ad oetabas pen-tieostes; item omnibus diebus quatuor Temporum; item omnibus Sábbalis áb hora nona et tota die sequenti usque ad diem Lunce ; item vigiliis sanctse Marisa, saneti Miehaelis, saneti Johannis Bap-tistes, Apostolorum omnium et sanctorum quorum Solemnitates a saeerdotibus Dominiois annunciantur diebus ; et omnium sanctorum in Kalendris Novembris, semper ab kora nona vigiliarum et subsequent solemnitate.” (Q-)
*519 (D) 1 Hale’s History of the Common Law, p. 36. “ There are divers canons made in ancient times and decretals of the Popes, that never were admitted here in England.”
Note C, by Sergeant Rmmington. “The Canon law which obtained throughout the West, till the twelfth century, was the collection of canons made by Dionysius Exiquus in 520, the Capitularies of Charlemagne, and the decrees of the popes from Siricius to Anastasius. No regard was had to any thing not comprised in these. Between the eighth and eleventh centuries, the canon law was mixed and confounded with the Papal decrees from St. Clement to Siricius, which, till then, had been unknown. This gave occasion to a new reform or body of the canon law, which is the collection still extant under the title of Concordia discordantitm, canonnne, first made by Ivo de Chartres in 1114, and perfected in 1151, (time of King Stephen, and fourteen years after the finding of a complete copy of the Pandects at Amalfi) by Gratian, a benedic-tino monk, from texts of scripture, councils’ and sentiments of the Fathers, in the several.points of Ecclesiastical polity, and containing those constitutions which have been denominated, by way of evidence, the Drones, and forming the first part of the canon law. It is now generally known by the name of'the De-creham of Gratian, which was formed in imitation of the Pandects of J ustinian, and is a confused unmethodical compilation, full of errors and forgeries. * * * * The authority of the canon law in England, (much abridged and restrained) depends upon Stat. 25 Píen. 8, c. 19.”
Reeves’ History of the English Law, chap. 1, shews that the separation of ecclesiastical from civil causes, was made by an ordinance of William the Conqueror; that tire, canon law first known in England, was formed by permission and under the authority of the Government; that in a national Synod, held A. D. 670, the codex canóntm veins ecclcsice Romanos, was received by the clergy, and in the time of William the Conqueror, with the assent of his great council, the Episcopal laws were reviewed and reformed: that in 1152, the teaching of the civil and canon law was forbidden by Stephen, apprehensive of the consequences to which the novel and bold opinions in the collection of Gratian might lead, but that the study was promoted by the clergy, and furnished authority for every species of usurpation. See Hallam’s Middle Ages, chap. 7.
(E) Reeves’ History E. L. Infrod. ck. “ Edward the Confessor is said to have *520 made a complete code of English law, for which the character of an eminent legislator has been conferred'on him by posterity. By the loss of the volume which contained his collection, we are left much in ignorance as to the unwritten customs of the times. It is not so with the written laws, for we have many of these still remaining.”
“ The first of the Saxon laws now in being, are those of King Ethelbert. These are the most antient laws in our nation, and are said to be the most antient in modem Europe. This King reigned from 561 to 636. The next are the laws of Hlothaire and Eadric, and of Wiletred, all Kings of Kent. Next are those of Ina, King of the West Saxons. After the Heptarchy, we have the laws of Alfred/ Edward the elder, Athelstan, Edmund, Edgar, Ehelred, Canute. Besides these, are canons and institutions, councils and other acts of a public nature. These are in the Saxon language, and were, some of them, collected in one volume, in folio, by Mr. Lambard, in the time of Queen Elizabeth, to which additions have since been made by Dr.' Wilkins, (in 1721) They compose, altogether, a body of Anglo Saxon laws for ciyil and ecclesiastical government.” [In the Library of the Court of Appeals at Charleston— mutilated and called “ Saxon Laws,” The English translation of these Saxoil codes, published by the Record Commission in England, under the superintendance of Mr. Thorpe, has not reached our Libraries.] See 2 Inst, proeme.
“We have refrained from mentioning some laws which have gone under tire name of Edward the Confessor, as they have been rejected for spurious, upon the fullest consideration of antiquarians. They are in Latin, and bear internal marks of a later period. They are supposed to have been written or collected about the end of the reign of William Rufus; and are to be found in the collections mentioned above.”
Sir Matthew Hale, in his History of the Common Law, ch. 1, refers to Lam-bard’s collection, and speaks of the laws of Edward the Confessor, as a compilation, whereof the English were always very zealous. In note B. Sergeant Rwmington says, “In truth, what were in reality the laws of Edward the Confessor, is much disputed by antiquarians, and our ignorance of them seems one of the greatest defects in English History. The collection of laws in Wilkins, which pass under the name of Edward, are plainly a posterior and ignorant compilation. Those to be found in Ingulf are genuine, but so imperfect and contain so few clauses favorable to the subject, that there is no great reason, for contending for them so vehemently.”
HoM’s Hist. C. L. c. 4. “ The manual, styled the Confessor’s laws, was but a small volume, and contains but few heads.” Again, “ many of the ancient laws which were approved and confirmed by William the Conqueror, and his ctmvmvme consilium, are set down by Hoveden: and they are transcribed in Mr. Selden’s notes upon Eadmerus, p. 173 — the same which Ingulfus mentions to have'been brought from London, and placed by him in the Abbey of Crowland, in the 15th year of William the Conqueror.”
Hume's Hist, of Eng. ch. 3. “The laws that pass under Edward’s name were composed afterwards.”
Spelman’s Glossary, Balivus. “Ipsasque ideo leges a recentiore vel auctas vel ad Nomanieum idiotisma redactas suspicort”
The laws of Canute expressly enjoin that all jurisdiction of ordeal and oath shall be intermitted on all festival days, the fasts, of the four times, and all other *521 fasts solemnly appointed; likewise they declare a vacation of legal proceedings from the festival of Advent to the octave of Epiphany, and from Septuagessima to the fifteenth day after Easter. (Sunday is included amongst festival days.) Sax. laws, fol. 100.
In the laws of Alfred the ten commandments are recited and confirmed, but there is no other express reference to suspension of legal proceedings on the Lord’s day. In the chapter concerning holidays, fol. 41, license is given to the free for twelve days from Christmas, the day Christ subdued the devil, the feast of St. Gregory, seven days before Easter, and as many after, the feast of St. Peter and St. Paul, and in the autumn the whole week before the feast of the Virgin, and the festival of all Saints; license is given to servants on the four Wednesdays of the four weeks in which public fast was used to be announced. In the chapter concerning sacrilege, fol. 30, double punishment is imposed upon theft committed on the Lord’s day, Christmas day, Easter day, Holy Thursday, and the day of Purification, as well as in time of Lent. See note A.
(P.) Reeve’s Hist. E. L. ch. 4. “The Anglo Saxons were governed by two reasons, the church and the necessity of cultivating the earth and collecting its fruits ; in distinguishing the periods of term and vacation, the former they called dies pads regis, the latter dies pads Dei es sondee ecclesioe; a division answering to that of the dies fasti and dies nefasti of the Romans, and to that of the diesjuridi-ci and dies feriales of the Civilians and Canonists.
A constitution made in the Synod held at Eanham, under King Ethelred, in the tenth century, forbade judicium, quod anglice ordeü dieiktr, et juramenta md-garia, at times of festival and fast; also from Advent till the octave of Epiphany, and from Septuagessima till fifteen days after Easter. Dicgd. Orig. Jurid. p. 89 ch. 32.
(G.) Mr. Foss, in his Judges of England, ch, 1, insists that originally there were only three terms, which were the three periods left after deducting the three longer intervals appropriated by this law to God and the Holy Church; so that Michaelmas Term formed no separate division, but, as well as Trinity, was comprehended in the long judicial period that commenced after the octave of Pentecost, and lasted till Advent, interrupted by no sufficient number of fasts or festivals to divide it into two; but that gradually a fourth vacation was made by the necessity of allowing time for collection of the autumnal products.
“That there were only three legal terms in the time of William the Conquer- or, is strongly corroborated by the fact, upon which all historians are agreed, that he (and indeed several of his successors) always held his court, or as it was called “wore his crown,” at three special periods of the year — Christmas, Easter and Whitsuntide. Regal magnificence and hospitality, the arrangement of the revenue, and the consideration of national affairs, would necessarily occupy se *522 veral of the earlier days of those festivals, and the conclusion of them would fall on the commencement of those periods which were specially devoted to the transaction of legal business.”
These canons and constitutions were all confirmed by William the Conqueror (H) and Henry [the Mrst ?] (I) the Second, (K) and so became part of the common law of England. (L)
(H.) JReeves’s Hist. E. L. ch. X. “We are told that in the fourth year of his reign, at Berkhamstead, in the presence ofLaufranc, archbishop of Canterbury, William the Conqueror solemnly swore that he would observe the good and approved laws of the kingdom, particularly Arose of Edward the Confessor; and he ordered that twelve Saxons should make inquiry in each county, and return what those laws were.”
Hale’s Hist. E. L. ch. 9. 1 ‘The King (William 1,) swore inviolably to observe the laws which the holy and pious Kings, his predecessors, and especially King Edward, had established; yet it appeared not what those laws were, and therefore a commime concilium was held, and the ancient laws were approved and con-finned. * * * They were re-affirmed and mingled with the coronation oath of William 1, and some of his successors.”
Saxon laws, 134, 136. The laws of Edward, as now preserved, are preceded by the decrees of William, containing his express confirmation of them, with his additions. See also Dugdale’s Orig. Jrnid. ch. 4, p. 5, referringto Ingulph. Hist, p. 519, b. andSelden’s San. Angl.lib. 0, p. 133.
(I.) Hale's Hist.E. E. ch. 7. “The great essay which Henry 1 made was the composing an abstract or manual of laws, wherein he confirmed the laws of Edward the Confessor; ‘cum illis emendationibus quibus earn patermeus emen-davit, baronum suorum concilio;’ and then adds his own laws, some whereof seem to taste of the canon law. * * The whole collection is transcribed in the Red Book of the Exchequer, from whence it is notv printed in the end of Lambard’s Saxon laws.”
Note C. by Sergeamb Rwmmglon. “There is a code which passes under the name of Henry 1; but the best antiquarians have agreed not to think it genuine. It is, however, a very ancient compilation, and may be useful to instruct us in the manners and customs of the times.”
(K.) Foss’s Judges of England, Yol. 1, p, 163. “According to the MS. laws of Henry 3, which remain in the Red Book of the Exchequer, the terms were at first settled in the manner in which they were left by Henry 1, (that is, by a charter of Henry 1, the Lent vacation which the law of Edward the Confessor had limited to “octabis Paschee,”was extended to “fifteen days after Easter.”) But when Ranulph de Glanville was appointed chief justiciary, the King (Henry 2) by his advice, expressly ratified the laws of Edward the Confessor and William the Conqueror, and accordingly we find in Glanville’s Treatise writs made returnable in Octabis or Clauso Pasehae, according to the old arrangement.”— Spehnan’s Reliquee, Origin of the Terms, 81; Glanville, lib. ii, chap. ii. See Dug. Orig. Jurid. 90.
(L.) Whether the constitution recited in the text was really in the compilation of Edward the Confessor or not, it had the same validity, if it was established as a law of the kingdom in the time of William the Conqueror or any of his successors. All the dies twn juridid mentioned in this constitution, must have been observed before the Statute of Westminster the first was passed. John’s reign afforded a fit opportunity for the establishment of any canon that tended to advance the clergy, by impeding the business of the temporal courts.
*523 Afterwards, in succeeding times, there happened several alterations and relaxations. The Statute of Westminster the first, (M\ and other statutes (N) were made to this purpose, and us *524 age,(0) or perhaps positive laws, not now extant, dispensed with, other days that u ere formerly unjuridioal.
*523 (M ) Stat. West. 1, c. 51. Et pur ceo que grand charitie serra de faire droit a touts en tout temps ou mestier serroit.
Purview est per assentment des Prelates, que assises de novel disseisin, mort d’auncestor, et de darrein presentment fuissent prises en l’Advent, en Septua-gesime, et en quaresme auxibien come le home prent l’enquesto; et ceo pise le Roy as Evegues.
2 Jnst. 264. This Act beginneth with a maxim of law: “Swmma chariias est facere ju$titio/n singulis in omnitem/pore yuando opusfuerit.”
The canon of holy church, upon pain of excommunication, had forbidden the holding of any secular plea or the swearing of any man on the Holy Evangelists in certain seasons, which Britton (who was Bishop of Hereford, * andwell versed in both civil and canon law) thus enumerates in addition to the Lord’s days:— Prom the beginning of Advent to the eighth day after Epiphany, from Septuagés-ima to the eighth day after Easter, the Ember days, the days of the Great Litanies, Rogation or Cauge days, the week of Pentecost, the time of harvest and of vintage, which dureth from the feast of St. Michael the Archangel, and the solemn feasts of the Acts of the Saints. Special dispensations had been previously obtained for taking inquests and for occasional removal of the impediment which the Canon offered to the administration of justice. This Act was a general dispensation for taking three kinds of assizes in the seasons of Advent and Lent, obtained from the Bishops at the special instance of the King. See Reeves’s Hist. E. L. c, 7, and c. 4. 3 Bla. Com. 275. Dugd. ch. 32,
The Act is a clear recognition of what was the previous law as to holy seasons. Its terms show to what an extent clerical usurpation had proceeded; and the fact that the dispensation thus obtained for certain assizes, has, ever since, without further legislation, served to legalize all judicial proceedings in the seasons mentioned in the Act, shows how intolerable the former restraint must have been.
(N.) Of these statutes the most material was 5 and 6 Ed. 6, c. 3. The preamble of thataet, very verbose, declares “that times and days are appointed wherein Christians should ceasefrom otheriabors, and apply themselves to holy works.” * * “Therefore the days are called holy days, not for the matter or nature of the days, nor for any Saint’s sake, (for so all days and times are God’s creatures, and all of like holiness,) but for the nature of the holy works whereunto such days are hallowed.” * * “Neither is it to be thought that there is any certain time or definite number of days prescribed in Holy Scriptures, but that the appointment, both of the time and also of the number of the days, is left by the *524 authority of God’s word to the liberty of Christ’s church, to be determined and assigned orderly in every country, by the discretion of the rulers and ministers thereof, as they shall judge most expedient to the true setting forth of God’s glory and tire edification of their people-” * * *
*523 * John le Breton, Judge, and afterwards Bishop of Hereford, died in May, 1275, 3 Ed. 1. The work called “ Britton,” cites Statutes of 6 and 13 Ed. 1; both of which periods were snbsequent to the Bishop’s death. The better opinion, adopted by Mr. Selden and others, seems to bo that the work is only an abridgment of Braoton, done into Norman-French, with the addition of subsequent alterations in the law, published in the name and by the authority of the King, about 13 Ed. 1. Henry de B' acton or Bretton, whose name is sometimes written, also, Brydon, Britton, Briton and Breton, Judge and Archdeacon of Barnstable, died about 51 Henry 3, 1267.
2 Foss’s Judges, 252, 260, citing Selden’s notes to Henglean Magna, 5, and Dugd. Chron, Series. 2 Reeves’s Hist. 89,90,281. 3 Bla. Com. 408.
*524 Sec. 1 enacted that the days following shall be kept and commanded to be kept holy days, and none others, to wit: all Sundays in the year, Christmas and the throe following days: the days of the Circumcision, of Epiphany, of the Purification, of the Annunciation, and of the Ascension, Monday and Tuesday in Easter week, Monday and Tuesday in 'Whitsun week, and fourteen Saints’ days, which were distributed through the year. “And none other day shall be kept and commanded to be kept holy day, or to abstain from lawful bodily labor.”
[Of the days here enumerated, all the dies non which are mentioned by Lord Coke (2 Inst. 2G4) and also St. Philip and St. Jacob, and sometimes St. Peter, fell within the terms.]
Sec. 2. The even of the day next before each of certain feasts shall be fasted, and none other.
Sec. 3. Bishops may inquire and punish offenders by the censure of the church.
Sec. 4. Pasting in Lent, or on Fridays and Saturdays, is not forbidden, or on other days ajipointed by Stat: 3, Ed. 6,-c. 19, saving only those evens whereof the holidays next following are abrogated by this Statute.
Sec. 5. If the feast be on Monday, the fast shall be on tire even of Saturday preceding, and not on Sunday.
Sec. 6. Husbandmen, laborers, fishermen, and all persons of every degree, upon the holidays aforesaid, in harvest or any other time, when necessity shall require, may labor, ride, fish, or work any kind Of work, at their free will and pleasure.
[This Statute was repealed 1 Mary, but the repealing act was repealed 1 James 1.]
Many Statutes before and after that of 5 and 6 Ed. 6, were passed concerning Sunday and other holidays, which are of great historical interest, but none of them directly affected the question of a Court’s sitting on Sunday.
Statutes 50 Ed. 3, c. 5, and 1 Rich. 2, c. 15, prohibited arrests in time of divine service.
27 Hen. 6, c. 5. (1448) . “ In consideration of the injury to God and his Saints, because of fairs and markets upon the high and principal feasts, as Ascension, Corpus Christi, Whitsunday, Trinity Sunday and other Sundays, also the Assumption, All Saints and Good Friday,” temporarily provided that fairs and markets (under pain of the forfeiture of the goods offered for sale) should cease on the days mentioned, except four Sundays in Harvest.
2 & 3 Ed. 6, o. 19, repealed all prior laws and usages concerning fasting and abstinence from meats, and forbade the eating of flesh upon any Friday or Saturday or the Embring days or Lent, or any other day commonly reputed a fish day.
5. Eliz. c. 5, forbade the eating of flesh on fish days. §39. “Whosoever shall, by preaching, teaching, writing or open speech, notify that any eating of fish or forbearing flesh mentioned in this Statute, is of necessity for the saving of the soul, or that it is the service of God, otherwise than as other politick laws are, such persons shall be punished as spreaders of false news.”
*525 The Mirror of Justices (P) says, “abusión est que tient pleas per dimenches (Sundays.) ou per auters jours defendus, ou devant le *526 goleii Ievie, ou noctanter, ou in dishonest lieu.’^Q.) * * * *
*525 Tliis Statute was continued by 3 Chs. 1, and 16 Chs. 1, c. 9 — subject to a reduction of penalties for the eating of flesh on fish days, made by 35 Eliz. c. 7.
A Stat. of 3 James 1, required divine service on every 5th of November, the anniversary of the discovery of the Gunpowder plot.
12 Chs. 2, c. 14, required the annual celebration of 29th May, as the anniversary of the Restoration.
12 Chs. 2, c. 30, directed that every 30th of January, (the anniversary of the execution of Chs. 1,) unless it shall be the Lord’s day, and then the next day, should be forever set apart as a day of fasting and humiliation.
A declaration published by James 1, and read in the churchesfwas intended to promote sports and lawful recreations on Sunday. Two Acts for the better observance of Sunday were passed, early in the reign of Chs. 1, which forbade persons assembling on Sunday, out of their own Parishes, for sport; and, also, their following bull baiting or other unlawful sports in their own parishes,
Subsequent temporary regulations were made perpetual by Stat. 29 Chs. 2, c. 7, which prohibited worldly labor, in general, on Sunday, and especially made void the execution or service on that day of any writ, process, warrant, order, judgment or decree, except in cases of treason, felony and breach of the peace.
A Statute of William 3, added to the holidays the days set apart by his Majesty, on extraordinary occasions.
The uniformity of process Act, 2 W. 4, c. 39, places Sundays on the same footing as Christmas day, and other days appointed for a public fast or thanksgiving, as to proceedings after the expiration of eight days from the service of process. An Act of 3 Geo. 4, had done the same, as to the opening of the Judges’ commissions on the Circuits.
The Law Amendment Act, 3 & 4 W. 4, c. 42, § 43, passed in 1833, enacted that no holidays should be observed in the Courts, or in the offices belonging thereto, except Sundays, Christmas day, and the three following days, and Easter Monday and Tuesday.
Sir. Edward Coke, (2 Inst. 264) writing after the Stat. of Ed. 6, enumerates the dies non jurídicos, thus: — 1. All Sundays. 2. Ascension day in Easter Term. 3. St. John the Baptist’s day, when it falls in Trinity Term. 4. The Purification in Plilary Term; and 5. All Saints’ and All Souls’ days in Michaelmas Term. The two last were cut off by subsequent Statutes, which altered Michaelmas Term so that it began on the morrow of All Souls. Then, until the Law Amendment Act, the dies non were Sundays, Ascension or holy Thursday, the Purification or Candlemas, and St. John the Baptist’s or Midsummer day, if it happened in Trinity Term — unless it was a Friday next after Trinity Sunday, in which case it was dies jwridicus, by Stat, 32 Hen. 8.
The Stat. of Ed. 6 continued to regulate holidays, chiefly, until 1833. Under it, the offices of Court were shut, or extra fees for opening them demanded, on the holidays, which did not fall within the terms. (See Tidd’s Pr. 55, 106. 3 Chit. Gen. Prac. 104.) But between the holidays under the Statute and dies non at common law, the Courts made a distinction.
The Statute was intended to lessen, not to increase, the number of holidays, and seemed to have been framed with such reference to the Terms as that, even before they were abridged, not more than two holidays, besides Sundays, fell into one Term; it did not make void proceedings on holidays; it indulged a lax *526 observance, and it provided no penalties besides ecclesiastical censure. For these or other reasons, the Courts at Westminster (which seem always to have struggled against the delays occasioned by interruptions of those Terms that had been wrested from the Church for the administration of justice) whilst they considered the Statute as commanding that dies 'turn, before observed, but not mentioned in the Statute, should no longer be kept, did not find in the Statute an imperative requirement that holidays in the Terms should be kept, that were mentioned in the Statute, but were not dies non at common law. They kept inviolable Ascension day and Purification day; (1 Chit. R. 400 — 9 B. & C. 243,) but they would not suspend business on St. Philip and St. Jacob’s day, (2 Smith’s Rep. 203,) nor on St. Peter’s; (7 Taunt. 182) as in like disregard of Statutes that contained no absolute prohibition, they refused to suspend on the anniversary of the Restoration, (7 Term. 332;) and on the anniversary of the Martyrdom, despatched common business before adjourning. The offices were required to be kept open on the days the Courts sat, and thus the Statute of Ed. 6, so far as it enjoined the keeping of holidays, had no effect in Term-time.
As the observation, that the Courts of justice have never been restrained by Act of Parliament from sitting on Sundays, and that the 29th of C. 2, c. 7. does not extend to giving judgments,—
wag nae(j2ess to restrain them from it by Act of Parliament. They could not do it by the canons anciently received and made a Part law land, and therefore, the restraining them from it by Act of Parliament would have been merely nugatory. But fairs, markets, sports, and pastimes were not unlawful to be holden *527 and used on Sundays at common law; and therefore, it was requisite to enact particular statutes to prohibit the use and exercise of ^ them upon Sundays, as there was nothing else that could hinder their being continued in use.
*526 No statute was at any other time passed, which forbade proceedings m Court on particular days. To the common law, and not to any statute, has always been ascribed the invalidity of legal proceedings on Sundays and other dies non; and before the Amendment of the Law Act, no Statute concerning Sunday or ■other holiday expressly required its observance by Courts.
(0.) The Acts of 25 Hen. 8, c. 21, concerning Peter Pence and dispensations; of the same year, c. 19, concerningthe Canon law; of 22 Hen. 8,c. 14, concerning sanctuaries; of 27 Hen. 8, c. 28, and 31 Hen. 8, c. 13, abolishing monasteries, and various other acts of that and the two succeeding reigns, whereby the Reformation was carried into effect, the Reformation itself, and tire civil wars and religious strifes of the seventeenth centuiy, must have lessened the reverence for some of the unjuridical days; and these causes, with the Statute of 29 Chs. 2, and •other Statutes which, although silent as to the sitting of the courts, made a wide difference in other respects between Sunday and other holidays, may well be supposed to have introduced and confirmed usages which, in the practice of the courts, deeply engraved the common law concerning Sunday, but obliterated it entirely as to some of the other dies non, and almost as to all others.
IQr Not one of the Statutes mentioned in these notes, amj other English Statute concerning Sunday, holidays, or the Terms of the Courts, was ever made of force in South Carolina.
(P.) Reeves's Hist. En. L. ch. 9. “By some pronounced older than the Conquest, but it is probable that Andrew Horne, whose name it bears, took an old book of the same name, and in the reign of Edward II, worked it into the volume we now see,” See Dugd. Orig: Jurid, c, 23.
*527 In Mackalley’s case, 9 Co. 66 b. it was objected that “ Sunday is not dies jzaridicus, and therefore, no arrest can be made in it; and every one ought to abstain from secular affairs upon that day.” But it was answered and resolved that no judicial act ought to be done in that day; but ministerial acts may be lawfully enacted in the Sunday.
(Q..) Conformable hereto was Law 10, Table 1, in the fragments of the Twelve Tables. “Let no judgment be given after the going down of the sun.”
And by the Public Law of France, in the reign of Louis XIV, (2 Domat. b. 14, Tit. 6, § 4) it was forbidden to proceed to the trial of a criminal in the afternoon, when the crime of which he was accused was of so high a nature as to deserve punishment of death, natural or civil, of the gallies, or of temporary banishment.
Lord Coke, in his commentary on the Stat. of Westminster the first, c. 51, (2 Inst. 2G4,) says that from Sir I ohn Fortescue it will be seen that there are horas jmidicm, from 8 o’clock, A. M. till meridian; the Courts not sitting in other hours, but the Judges giving themselves to refreshment and study. This, as all see and many feel, is not the usage of modern times; but this, like some of the propositions quoted from the Mirrour, serves to point to a distinction between the abuse of discretion and the violation of prohibition — between what may be disapproved and what is void.

 Stat. 27, Hen. 6, c. 5. Cro. Eliz. 485. In the laws of Canute (Sax. Laws, 100) is a prohibition of hunting and secular labor on the Lord’s day, and likewise of markets and assemblages of people without necessity.

 Statutes of Chs. 1. Note N, Appendix.

 1 Taunt. 131. Mackally’s case, 9 Co. 66. 12 Wen|l- 57.
Contra. — Lord Coke says, 2 Inst. 264, the ancient law extended the prohibition not only to legal proceedings, but to contracts, &e., citing a passage from the league between Edward, the elder, and Guthrum, the Dane. “Si Daeus, &c.,” Saxon Laws, fol. 54. The Stat. 29 Chs. 2, c. 7, is often said to be in affirmance of the common law. 3 Chit. Gen. Prac. 1604.

 See Impey’s Practice, 96.

 1 Wood. Lect. 63. “Mr. Elsynge cites many precedents of Parliaments being summoned to meet on Sundays, from Ed. 1 to Ed. 3, and subsequent Parliaments have sat on that day; but this is not consistent with the practice of modern times.”
If a sitting of Saturday, prolonged after midnight, be a sitting on Sunday, modern instances are frequent. In Blackstone’s report of Swann v. Broome, Lord Mansfield is reported to have said: “I myself have sate in Parliament on Sunday and to have mentioned an instance when, in 1760, both houses met on Sunday, but adjourned, because the Lord Steward did not attend.

 Council of Frankfort, A. D. 794. Labbo et Coss. Tom. vii. p. 1061.
Dicretvm Gratiani, pars 3, Distinctio 3, c. 1, p. 2140 — the rule made applicable to all festivals, many of which are enumerated.
Gilbert Corp. Jur. Canon, Tom. ii, de Ecclesiastical; de Festis, Spec. Regala, ix. xvi.
Contra. — Peter Dew, writing at a later period, (Theol. Tom. ii. De Legibus, No. 80,) says, “Notandum tempus diei sanctifieandi apud Christianos esse a media noete usque ad mediam noctem se-quentem, aliter quam apud Judaeos, qui a vespera usque ad vespe-ram diem Festum servabant.”
[For the two last references, I am indebted to a learned divine— the library and assistance of another have also aided me greatly in pursuing researches upon subjects with which my reading has not made me familiar.]
Gradually the observation of festivals in most Catholic countries ' of Europe, has been accommodated to the division of time made by the civil law, although it is said that even yet, in many parts of Italy, the ordinary day begins at sunset. The keeping of the vigil of every festival was an early usage amongst Christians, to which reference is made in the law of Edward the Confessor, and in the Stat. of Ed. 6. “ The Saturday before Easter, known by the name of the Great Sabbath, was kept as a universal fast over the whole church, (even by the Greeks, who kept other Saturdays as festivals ;) and they continued it not only till evening, but till cock-crowing in the morning, (that is, the beginning of the fourth watch, 3 o’clock; A. M.) which was the supposed time of our Savior’s resurrection.”— Bingham’s Works, vol. 7, book 21, ch. 1, sec. 32.

 In the case of Fox v. Abel, 2 Conn. R. 541, some of the Judges insisted (as has often been done,) that from Matt, xxviii. 1, it appeared that the Jewish sabbath ended at dawn or sunrise Sunday morning. Without entering into this theological question, it is sufficient to refer to Jenning’s Jewish Antiquities, book 3, ch. 1; Goodwin’s Moses and Aaron, b. 3, c. 1; and Eobinson’s Calmet, “ Day,” for the learning on the subject. The passage from Matthew, and parallel passages from the other Evangelists, [Mark xiv. 1,2; Luke xxiv. 1; and John xx. 1,] are considered, and the conclusion drawn, that “ in the end of the Sabbath,” means shortly after the Sabbath was ended.
The command in Levit. 23, 37 — “ From evening to evening shall ye celebrate your Sabbath,” may have related only to the day of atonement, appointed for the tenth day of the seventh month, annually, but it seems to be in analogy to the observance of the ordinary Sabbath.
Lord Coke says, [upon what authority does not appear,] that the Jews, like the Chaldeans and Babylonians, began the day at sunrise ; but it will be seen by the references I have made, that the ecclesiastical day of the Jews, before the time of Moses, began at sunset, and that afterwards their civil day did too; in which, as in all their customs, they were distinguished from the nations around them, and made a peculiar people.
In confirmation of this, we have the unvarying usage of all Jews in modern times, and laws as early as Augustus, exemptings Jews from summons into Court, at all times between 3 o’clock of the sixth day, and the' end of their sabbath. — Lervis’ Orig. Heb. vol. 2, p. 577.
[For this reference, and those I will make to Calvin and Luther, (none of which I have been able myself to verify,) as well as for many useful suggestions and much valuable information, I owe acknowledgments to the kindness of Dr. Lieber, Professor of History and Political Economy in our College, who is as ready to dispense the full stores of his learning, as he is diligent in increasing them.]
It is the undisputed practice of our Courts to sit Saturday evening-before midnight. There is no sufficient authority for saying that the Jews began either their ordinary day or their Sabbath at midnight. If Sunday must be taken to begin when the Jewish sabbath ended, then to fix the dividing point of time at 3 o’clock, or sunset, Saturday, would prove too maeh for those who say that a Court cannot, by common law, sit for twenty-four hours after that point; to fix the point at dawn or sunrise next morning, would prove too little.

 Conc. Laodicea, c. 29; Labbeet Coss. Tom. 1, p. 1501.

 Calvin’s Inst. “ Fourth Commandment.” Luther’s works, (Walch’s edit.) viii. vol. 2471; x. 1629, 266, 190, 53 ; iii. 1794, and some very strong remarks on the subject in his Table Talk.

7c) The State v. Naburs, 6 Alab. R. 200,

 An Act to authorize and require juries empannelled in Charleston District, to sit, in certain cases, beyond the term of one week, for which they are usually empannelled.
Whereas, by ah Act of the General Assembly of this State, juries are directed to be empannelled for the district of Charleston, to sit for the term of one week only, although the terms established for holding the courts of the said district are of several weeks duration, and many causes of litigated and important nature, commenced and not determined within the term for which the said juries are so empannelled as aforesaid, prove to he mis-trials, and very great delays and manifest injustice are occasioned thereby.
I. Be it therefore enacted by the honorable the Senate and House of ^Representatives, now met and sitting in General Assembly, and by the authority of the same, That any jury in Charleston district which shall hereafter he empannelled, and charged with the trial of any issue, civil or criminal, whose term of one week shall terminate or expire before the final decision of such issue, such jury shall not be discharged as heretofore, but it shall and may be lawful for thq presiding judge to adjourn the said jury to tbe ensuing Week, in like manner as juries are adjourned from day to day; and such jury shall duly attend at the time to which they are so adjourned, and resume the consideration of such issue, until such jury shall have finally made up their verdict and disposed of such issue, or shall otherwise he lawfully discharged from the consideration thereof.; any law, custom or usage to the contrary thereof in any wise notwithstanding.
II. And be it further enacted by the authority aforesaid, That any juror composing such jury as shall be so adjourned-as aforesaid, *510 -who shall refuse or negleot- to attend at the time and place to which he shall be so adjourned in conformity with this Act, shall be subject •to the same pains, forfeitures and penalties, as by the laws of this ■State are usually imposed upon jurors who shall make default: Provided always nevertheless, that nothing in this Act contained •shall be construed or considered so as to give any extension of the terms already appointed by law for holding the said courts of Charleston District.
III. And be dt further enacted, by the authority aforesaid, That the provisions icontained in the foregoing clauses shall apply to and be enforced .in every other district in this State in which the courts may or shall be held for more than one week during any term, and the jury shall be empannelled for one week only.

 Hale’s Hist. C. L. e. 12; in note 11 quasi captivi induclimtun nemine intromisso.n Hale’s P. C, 296, 307. Co. Litt. 227.